UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

SIMONE CANTRELL,

      Debtor.

_____/

Case No. BG 10-03241
Chapter 7

**OPINION REGARDING DEBTOR'S MOTIONS FOR CONTEMPT
AND VIOLATION OF DISCHARGE INJUNCTION**

Appearances:

Simone Cantrell, Grand Rapids, Michigan, *pro se* Debtor.

Cheryl D. Cook, Esq. and Brian L. Groen, Esq., Rochester, Michigan, attorneys for Bank of America, N.A.

Dawn N. Williams, Esq., Grand Rapids, Michigan, attorney for Select Portfolio Servicing, Inc.

## I.      INTRODUCTION.

Simone Cantrell (the "Debtor") filed her chapter 7 bankruptcy case on March 6, 2010, over nine years ago. The Debtor's bankruptcy schedules showed that she owned a residence located at 660 Everglade in Grand Rapids, Michigan, subject to two mortgage liens, the first of which was serviced by Bank of America Home Loans. The mortgage debt was not reaffirmed, the case was administered in a typical manner, and the Debtor received her discharge on June 15, 2010. The trustee filed his Report of No Distribution on August 1, 2011, and the case was closed on September 19, 2011.

The Debtor, with her bankruptcy discharge, had presumably obtained her opportunity for a fresh start and moved on with her life. However, despite the bankruptcy

case, the Debtor and her family continued to occupy their residence and make payments on the mortgage debt.  This arrangement continued for approximately seven years, until the Debtor eventually stopped making her payments sometime in 2017 and the lender's assignee foreclosed on the property.

Then, on November 8, 2018, the Debtor filed a motion to reopen her bankruptcy case alleging that Bank of America ("BOA"), the original mortgage loan servicer, and Select Portfolio Servicing, Inc. ("SPS"), the entity that took over servicing in 2017, had violated the discharge injunction by attempting to collect a prepetition debt and by foreclosing on her home.  The court reopened the case on December 19, 2018.  The Debtor filed her Motion for Contempt on December 28, 2018, and an amended Motion for Contempt on February 22, 2019.  The Debtor's motions assert that BOA and SPS should be held in contempt of court for their alleged violations of the discharge injunction.[1] Specifically, she alleges that BOA violated the discharge injunction by sending her monthly statements, entering into a Loan Modification Agreement with her, and sending her related solicitations about modification options.   After servicing responsibilities transferred to SPS, the Debtor alleges that SPS also violated the discharge injunction by sending monthly statements and by placing more than seventeen phone calls to the Debtor's residence.  The Debtor requests damages of approximately $160,000 for these alleged violations.

---

[1]     The Debtor's motions also allege that that actions taken by BOA and SPS violated the automatic stay, 11 U.S.C. § 362.  However, none of the communications reflected in the exhibits attached to the Debtor's motions occurred while the automatic stay was in effect.   One of the monthly statements was sent prior to the filing of the Debtor's bankruptcy case and the others occurred after entry of her discharge.  For this reason, the court has not addressed the Debtor's arguments regarding violation of the automatic stay in this opinion.

BOA and SPS maintain that the post-discharge statements and communications sent to the Debtor were for informational purposes only and were not attempts to collect the mortgage debt from the Debtor personally.  To the extent any communications are construed as efforts to collect payments from the Debtor, BOA and SPS argue that the communications fall under § 524(j), which permits secured creditors to seek or obtain periodic payments in lieu of pursuing *in rem* relief on their lien so long as the actions are undertaken in the ordinary course of business.

## II.      JURISDICTION.

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a); L. Civ. R. 83.2(a) (W.D. Mich.).  The Debtor's claims for alleged violations of the discharge injunction are core proceedings and this court has authority to enter a final order.  28 U.S.C. § 157(b)(2)(O); *In re Perviz*, 302 B.R. 357, 365 (Bankr. N.D. Ohio 2003).

## III.      FINDINGS OF FACT.

Since the re-opening of her bankruptcy case, the Debtor has represented herself *pro se*.  Her original Motion for Contempt included 237 pages of exhibits consisting of correspondence and other information the Debtor received from BOA and SPS, mostly after her bankruptcy filing.  The amended motion also included 224 pages of exhibits, most of which are the same as those attached to the original motion.[2]  In addition, the

---

[2]      Unless otherwise specified, the citations to the Debtor's exhibits in this Opinion refer to the exhibits attached to the original Motion for Contempt & Violation of Discharge Injunction 11 USC § 524 and Sanctions for Creditors['] Violation of Automatic Stay 11 USC § 362, Dkt. No. 27.  The exhibits are cited by their page number, e.g., "p. 123."

Debtor submitted an Affidavit of Damages in support of her motions.  (Dkt. No. 40.)  BOA and SPS both filed responses to the Debtor's amended motion, which also attach various exhibits.  At a hearing held before this court on April 11, 2019, the parties stipulated that the court could consider all exhibits attached to the parties' respective pleadings in deciding the Debtor's motions.  The Debtor filed a Motion for Discovery on April 18, 2019, seeking additional discovery on both BOA and SPS.  (Dkt. No. 51.)  The court denied the motion for the reasons set forth in its Order Denying Debtor's Motion for Discovery.  (Dkt. No. 52.)  The court has carefully reviewed all of the exhibits.  The following findings of fact are based on those documents and the overall record in this bankruptcy case.

The Debtor purchased her residence located at 660 Everglade, Grand Rapids, Michigan in June of 2005.  She financed the purchase by obtaining a loan for $95,600 which was secured by a mortgage on the property.  The lender was America's Wholesale Lender and MERS, as nominee for America's Wholesale Lender, was the mortgagee.  (SPS's Response to Debtor's Amended Motion for Contempt, Dkt. No. 41, at Exh. 1.)  Bank of America was the servicer of the loan until servicing transferred to SPS on July 16, 2017.  (SPS Response, Dkt. No. 41, at Exh. 2.)

When the Debtor filed her bankruptcy case in March 2010, she listed her real property on Schedule A and indicated that its fair market value was $123,600.  Schedule D identifies two creditors with security interests in the property:  creditor "Bac Home Loans Servici" [sic] is listed as being owed $91,343.00 on a first mortgage, and HSBC Mortgage Corp. is identified as being owed $22,665.00 on a second mortgage.  The Debtor's Statement of Intention indicates her intent to reaffirm both debts.  The Debtor has stated, both in her pleadings and at the hearings on her contempt motions, that she believed she had entered into a reaffirmation agreement with BOA prior to her discharge being issued

on June 15, 2010.  However, the court's docket does not reflect a reaffirmation agreement with either BOA or HSBC, nor any other activity concerning the Debtor's residence. Neither secured creditor filed a claim, a motion for relief from stay, or any other appearance in the case.  The trustee did not administer or sell the property, which was ultimately abandoned back to the Debtor when the case was closed on September 19, 2011.

Throughout her bankruptcy case and after its conclusion, the Debtor continued to reside in the property and continued making periodic payments to Bank of America. During this time period, the Debtor received various correspondence from Bank of America which is described in greater detail below.

On May 14, 2014, the Debtor executed a Home Affordable Modification Agreement with Bank of America.  (SPS Response, Dkt. No. 41, Exh. 4; BOA Response, Dkt. No. 42, Exh. 1.)  The Modification Agreement changed the terms of Debtor's mortgage such that the monthly principal and interest payment amount was reduced from $711.56 to $564.09, plus an estimated monthly escrow amount of $227.38 (same as the pre-modification amount).  The mortgage interest rate was reduced to 4.750% from 8.125%.  The principal balance increased to $90,055.41 because it included all amounts and arrearages that were past due upon the effective date of the modification.  The Modification Agreement included, at paragraph 1H, the following language:

> I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the [prior] Loan Documents.  Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

(SPS Response, Dkt. No. 41, Exh. 4.)  The Debtor does not dispute that she signed the Modification Agreement, although she asserts that BOA "induced" her to enter into the agreement.

Servicing of the Debtor's loan was transferred to SPS in July of 2017.  The Debtor was informed of the servicing transfer by letter dated July 17, 2017.  (SPS Response, Dkt. No. 41, Exh. 2.)  Like almost all of the correspondence sent to the Debtor by BOA and SPS, the letter includes as statement at the bottom of the first page which reads: "This information is intended for informational purposes only and is not considered an attempt to collect a debt." (*Id.*)  The second page includes a more detailed disclaimer: "This statement does not represent and is not intended to be a demand for payment.  This notice is for informational purposes only.  If you have filed bankruptcy or have been discharged in bankruptcy, please be advised that you should contact legal counsel with any questions regarding the mortgage." (*Id.*)

The original mortgagee, MERS, assigned its interest to The Bank of New York Mellon on March 13, 2018.  (SPS Response, Dkt. No. 41, Exh. 3.)  SPS and the Bank of New York Mellon initiated foreclosure proceedings in May of 2018, due to the Debtor's default in making payments on the loan.  The Debtor attempted to stop the foreclosure process by filing two civil suits against SPS and other named defendants in the United States District Court for the Western District of Michigan.  The District Court ultimately rejected the Debtor's assertions that the foreclosure was invalid because of the bankruptcy discharge and dismissed the law suits.  However, the District Court's dismissal was without prejudice to the Debtor's ability to bring claims regarding possible violations of the discharge injunction to the extent the defendants took actions beyond *in rem* foreclosure of the mortgage.  (*See* U.S. District Court Case Nos. 1:18-cv-00610-RJJ-

6

PJG, 1:18-cv-00840-RJJ-PJG; BOA Response, Dkt. No. 42, Exh. 2.)  The property was sold to LNT Ventures, LLC, at a foreclosure sale held on September 19, 2018.  (Debtor's Motion, Dkt. No. 27, at ¶ 18.)

Now, in her Motions for Contempt, the Debtor complains that the post-discharge actions of BOA and SPS violated the discharge injunction and that they should each be found in contempt of court.  The Debtor has submitted voluminous exhibits purporting to establish specific violations of the discharge injunction committed by Bank of America and SPS.  The court has reviewed each exhibit and categorizes them as follows:

A.  *Alleged Violations by Bank of America.*

The exhibits pertaining to actions taken by Bank of America are attached as Exhibit B to the Debtor's original motion.  They include:

1.  Monthly Statements.

The Debtor submitted numerous monthly statements she received from Bank of America.  She alleges that the statements represent impermissible attempts to collect the mortgage debt from her personally after entry of her bankruptcy discharge.

The first monthly statement shows a payment due on January 1, 2010, which was prior to the filing of her chapter 7 case.  (Debtor's Exh., p. 165-66.)  This statement predates the bankruptcy and, by definition, is not an attempt to collect a prepetition debt in violation of the discharge injunction.

The next monthly statement is dated June 16, 2011, and shows a payment due on July 1, 2011, which is after entry of the Debtor's discharge but prior to the closing of her bankruptcy case.  (p. 158-59.)  The statement includes a payment coupon and does not contain any disclaimer language acknowledging the Debtor's bankruptcy filing, her discharge, or her lack of personal liability on the debt.

7

The Debtor's bankruptcy filing is reflected in the next group of monthly statements, the first of which shows a payment due on October 1, 2011.  (p. 156-57.)  This statement includes very specific bankruptcy-related disclaimers.  Under a heading entitled "The Impact of the Bankruptcy," it explains:

> Our records indicate that in the past you received a discharge of this debt in a bankruptcy case.  Section 524 of the Bankruptcy Code tells us the discharge of this debt means you have no personal obligation to repay it.  The discharge also protects you from any efforts by anyone to collect this discharged debt as a personal liability of the debtor.  You cannot be pressured to repay this debt.  On the other hand, the security agreement allows foreclosure if the requirements under the loan documents are not met . . .

(*Id.*)  The statement also explains that it is providing "detailed loan information as a courtesy," and is neither an attempt to collect the discharged debt nor a demand for payment.  It provides a phone number to call if the recipient does not want to receive monthly statements in the future.  The monthly statements received by the Debtor for payments due November 1, 2011 (p. 151-55), August 1, 2013 (p. 135-37), and November 1, 2013 (p. 145-150) all include this same detailed disclaimer language.[3]

Beginning in late 2013, the format of the BOA monthly statements changed slightly. The new form contains numerous disclaimers, including one at the top which states:

> THIS STATEMENT IS BEING SENT FOR INFORMATIONAL AND/OR COMPLIANCE PURPOSES ONLY.  IT SHOULD NOT BE CONSTRUED AS AN ATTEMPT TO COLLECT A DEBT, A DEMAND FOR PAYMENT OR AN ATTEMPT TO MODIFY ANY APPLICABLE BANKRUPTCY PLAN TERMS OR DISCHARGE INJUNCTION.  IF YOU HAVE RECEIVED A

---

[3]     The Debtor's exhibits also include a statement dated August 20, 2013.  The first and last pages of this exhibit, pages 1 of 8 and 8 of 8, are omitted.  (p. 129-34.)  Because the form is nearly identical to the other statements received during this time period, the court concludes that the relevant disclaimer language would have appeared on the omitted first page of the form.  The court also notes that three of the pages that are included in the Debtor's exhibits are clearly labelled "FOR INFORMATION PURPOSES."  (p. 129-31.)

DISCHARGE OF YOUR PERSONAL OBLIGATION TO REPAY THE DEBT ASSOCIATED WITH THE REFERENCED LOAN, Bank of America, N.A. WILL NOT TAKE ANY ACTION AGAINST YOU BUT HAS RETAINED THE RIGHT TO ENFORCE ITS RIGHTS AGAINST THE PROPERTY SECURING THIS LOAN.

(*See, e.g.*, p. 140-42.)  The statements received by the Debtor for December 2013 (p. 140-42), March, October, and December 2014 (p. 121-125, 110-12, 106-09), February, April, May, June, September, and October 2015 (p. 96-99, 92-95, 88-91, 84-87, 80-83, 76-79) and May, August, and October 2016 (p. 55-58, 44-47, 40-43) all utilize this same form.

The monthly statement form changed slightly again in early 2017, but the disclaimer language remained the same.  The statements received by the Debtor for February, March, April, May, June and July 2017 (p. 28-31, 36-39, 32-35, 24-27, 18-23, 14-17, 10-13, 6-9) use the same form and disclaimer language.

   2.   Other Statements.

The documents submitted by the Debtor also include a Combined Monthly Statement for the period from February 12, 2010 to March 12, 2010 (p. 160-64) and an eBanking Account Summary for October 12, 2013 to November 8, 2013 (p. 126-28). These documents simply summarize the current status of the Debtor's bank accounts. The Combined Monthly Statement references the Debtor's mortgage account and shows a balance of $90,961.09.  However, neither document includes a demand for payment or otherwise attempts to collect a debt.

   3.   Interest Rate Adjustment Letters.

The Debtor's exhibits include two letters informing her of adjustments to the interest rate on her home loan, one dated July 31, 2013 (p. 138-39) and the other dated May 1, 2014 (p. 119-20).  Both include disclaimers stating that the documents are for

9

informational purposes only and should not be construed as attempts to collect the debt from the recipient personally.

    4.  <u>Escrow Account Reviews</u>.

The Debtor also received correspondence from Bank of America regarding her mortgage escrow account and the escrow portion of her monthly loan payments.  She attaches four letters, dated May 6, 2014 (p. 114-18), January 12, 2015 (p. 100-05), August 1, 2016 (p. 48-54), and August 24, 2017 (p. 4-5).  All four include disclaimer language at the bottom of the first page, indicating that the notices are for informational purposes only and are not attempts to collect a debt or demands for payment.

    5.  <u>Notices of Default / Payments Due</u>.

The Debtor's exhibits include a Notice of Intent to Accelerate dated January 15, 2015, informing the Debtor that her home loan is in default because required payments have not been made.  (p. 66-72.)  The notice encourages the Debtor to cure the default and outlines options that may be available to prevent foreclosure.  In the event of foreclosure, it states that the secured creditor "may pursue a deficiency judgment against you to collect the balance of your loan, if permitted by law."  (p. 67.)  However, the notice also includes a full page of disclosures advising that as to borrowers who have previously filed for bankruptcy or obtained a discharge, it is for information only, is not an attempt to impose personal liability on the debt, and that the recipient of the notice is "not obligated to discuss [their] home loan with [BOA] or enter into a loan modification . . . ."  (p. 69.)

The Debtor also received a notice of a past due payment dated April 11, 2017.  (p. 22-23.)  Again, the notice encourages the Debtor to make the overdue payment but includes appropriate disclaimer language.

6.   <u>Responses to Inquiries from the Debtor</u>.

The Debtor's exhibits include several responses from Bank of America, and their counsel, Blank Rome, LLP, to inquires made by the Debtor.   The letters are dated December 3, 2015 (p. 75), December 15, 2015 (p. 73-74), January 11, 2016 (p. 61-62), and January 14, 2016 (p. 59-60).   These letters were solely in response to inquiries made by the Debtor and do not represent attempts to collect a debt from her personally.   In addition, the letters from BOA include appropriate disclaimer language.

7.   <u>Other Generic Correspondence</u>.

The remainder of the Debtor's exhibits pertaining to Bank of America consist of general correspondence introducing BOA's Customer Relationship Manager (p. 143-44), acknowledging the Debtor's participation in the Home Affordable Modification Program (p. 113), and outlining refinancing options (p. 2-3).   None of these documents seek payment or otherwise attempt to collect a debt from the Debtor.

B.   *Alleged Violations by SPS*.

The exhibits pertaining to SPS are attached as Exhibit A to the Debtor's motion. They include:

1.   <u>Monthly Statements</u>.

The Debtor attached five monthly statements she received from SPS.   Each statement includes a payment coupon, but also has prominent disclaimer language.   The first two, dated October 13, 2017 (p. 40-41) and November 15, 2017 (p. 30-31), respectively, do not list a payment amount or otherwise indicate an amount due.   They state at the top:

THIS IS NOT AN ATTEMPT TO COLLECT A DEBT.

> THIS STATEMENT IS BEING SENT FOR INFORMATIONAL PURPOSES ONLY.
>
> We acknowledge your bankruptcy filing.  Any payments made on your account should be sent to the address listed in the attached coupon.

(*Id.*)  The later statements dated July 12, 2018 (p. 7), August 15, 2018 (p. 8-11.), and September 13, 2018 (p. 3-4), show the amount of each regular monthly payment and the amounts that are past due (over $13,000 as of the September 2018 statement).  The disclaimer language is slightly different than the prior statements but conveys the same idea.  It reads:

> Our records show that either you are a debtor in bankruptcy or you discharged personal liability for your mortgage loan in bankruptcy.
>
> We are sending this statement to you for informational and compliance purposes only.  It is not an attempt to collect a debt against you.

(*See, e.g.*, p. 7.)

    2.   <u>Other Statements and Escrow Information</u>.

The exhibits submitted by the Debtor include two "Payoff Statements" from SPS, dated August 22, 2017 (p. 53-57) and October 17, 2017 (p. 36-39).  Both statements indicate that they were requested by the Debtor.  Both statements also include standard disclaimer language on the last page:

> This information is intended for informational purposes only and is not considered an attempt to collect a debt.

(*See, e.g.*, p. 56.)

The Debtor also attaches the cover letter for an "annual account activity statement" dated February 2, 2018 (p. 18, actual statement not included) and a notice regarding her Annual Escrow Account Disclosure Statement and new escrow payment amount dated September 11, 2018 (p. 5-6).  Both documents include standard disclaimer language.

3. <u>Correspondence Regarding Servicing Transfer</u>.

The Debtor's exhibits include two letters regarding the transfer of mortgage servicing to SPS: a Servicing Transfer Notice dated July 17, 2017 (p. 61-69) and a letter regarding payment of the Debtor's homeowner's insurance premium dated August 15, 2017 (p. 58.) Both include a statement in bold print at the bottom: "This information is intended for informational purposes only and is not considered an attempt to collect a debt." (*See, e.g.*, p. 61.)

4. <u>Foreclosure Information</u>.

The Debtor attaches six letters informing her that foreclosure proceedings have been initiated, outlining options to avoid foreclosure, and detailing the scheduling of the foreclosure sale. (p. 12, 13, 14-17, 19-20, 24-25, 26-29.) All but one of the letters[4] include accurate and specific references to the Debtor's bankruptcy case, the discharge of her personal liability on the mortgage debt, and the continued existence of the lien on the real property. One letter, dated December 5, 2017, includes a full paragraph disclaimer which states:

> This communication is an attempt to collect a debt and any information obtained will be used for that purpose. However, to the extent your original obligation was discharged or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this notice is for compliance with non-bankruptcy law and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation . . . .

(p. 26-29.) All of the other letters include the short, standard disclaimer language in bold print at the bottom. (*See, e.g.*, p. 12.)

---

[4] The letter that does not include disclaimers was dated February 1, 2018, and was addressed to the Debtor's former attorney, Jeffrey R. Portko. (p. 14-17.) The attachments to the letter outline options for bringing payments current and avoiding foreclosure. They include a standard disclaimer on the last page. (p. 17.)

5. <u>Responses to the Debtor's Inquiries</u>.

The Debtor's exhibits include twelve letters that were sent by SPS in response to inquiries received from the Debtor. (p. 21, 22, 23, 32, 34, 35, 42-43, 46-47, 48, 49-50, 51, 52.) Of these letters, one includes a disclaimer that reads:

> This is not an attempt to collect a debt but a response to your request for information.

(p. 46-47.) All of the others include the standard disclaimer at the bottom:

> This information is intended to informational purposes only and is not considered an attempt to collect a debt.

(*See, e.g.*, p. 35.) Each letter acknowledges SPS's receipt of specific correspondence or references an inquiry from the Debtor. Copies of some of the Debtor's letters are also attached as exhibits. (*See, e.g.*, p. 44-45, 57, 59-60.)

6. <u>Phone Calls</u>.

Finally, the Debtor's exhibits include a log of thirteen phone calls the Debtor alleges she received from SPS between July 28, 2017 and August 11, 2017. (p. 2.) The Debtor asserts that this is only a partial list of the calls that she actually received. She further states that she asked for the calls to stop on three occasions, but that the calls continued despite her requests.

In response to the Debtor's motion, SPS submitted a declaration from Sherry Benight, a Document Control Officer for SPS. (SPS Response, Dkt. No. 41, Exh. 5.) The declaration states that SPS placed twelve calls, no more than one per day, to the Debtor between August 1 and August 21, 2017. (*Id.* at ¶ 7.) It explains that the calls were made in the ordinary course of business and "for the purposes of obtaining periodic payments in lieu of foreclosing" on the mortgage. (*Id.*) Of the twelve calls, SPS states that it reached an unidentified person who was not the Debtor on three occasions. (*Id.* at ¶ 9.) According

14

to the declaration, the other nine calls went unanswered and SPS did not leave a message.  (*Id.* at ¶ 11.)  Upon receipt of a "cease and desist" letter, SPS states that it made no further calls.  (*Id.* at ¶ 12.)

    C.  *Alleged Damages*.

The Debtor submitted an Affidavit of Damages, which purports to identify and quantify the damages she sustained as a result of BOA and SPS's alleged violations of the discharge injunction.  (Affidavit of Damages and Statement of Claim, Dkt. No. 40.) Specifically, the Debtor asserts that BOA sent a total of 84 statements plus various "mortgage loan modification solicitations." She also alleges that SPS sent her 14 statements and made "no less than 17 phone calls" in an attempt to collect the mortgage debt.  Without providing any basis for her calculation, she requests $1,000 for each of these violations, for a total of $115,000.  In addition, the Debtor asks this court to award $40,000 "for emotionally distressing [the D]ebtor and her family," $5,000 in attorney's fees, $500 in gas, $500 for "copies/parking/notary/etc.," and "any other damages the court deems just and necessary."  (*Id.* at 2.)

## IV.   DISCUSSION.

The chapter 7 discharge received by the Debtor on June 15, 2010, extinguished the Debtor's personal liability on her prepetition debts, including the secured debt owed to her mortgage lender and serviced, at the time, by Bank of America.  *See* 11 U.S.C. § 727(b).  Pursuant to § 524(a)(2), the discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor . . . ." 11 U.S.C. § 524(a)(2).

It is well-settled that creditors who act in violation of the discharge injunction may be held in contempt of court. *Lohmeyer v. Alvin's Jewelers (In re Lohmeyer)*, 365 B.R. 746, 749-50 (Bankr. N.D. Ohio 2007) (citing *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 421-23 (6th Cir. 2000)) (additional citations omitted). Courts within the Sixth Circuit have historically held that contempt sanctions for violation of the discharge injunction are appropriate when a creditor's actions are willful, that is, when "the creditor deliberately acted with actual knowledge of the bankruptcy case." *See In re Martin*, 474 B.R. 789, 2012 WL 907090, *5 (6th Cir. B.A.P. Mar. 7, 2012) (unpublished opinion) (citations omitted); *In re Kanipe*, 293 B.R. 750 (Bankr. E.D. Tenn. 2002) (citing *Hardy v. United States (In re Hardy)*, 97 F.3d 1384, 1390 (11th Cir. 1996)) (additional citations omitted). Under this standard, a willful violation of the discharge injunction could occur "even though the creditor believed in good faith that its actions were lawful." *McCool v. Beneficial (In re McCool)*, 446 B.R. 819, 823 (Bankr. N.D. Ohio 2010) (citations omitted).

The United States Supreme Court recently rejected a similar willfulness standard and clarified the standard that applies when a violation of the discharge injunction is alleged.[5] *Taggart v. Lorenzen*, __ U.S. __, 139 S. Ct. 1795 (2019). The Court held that

---

[5]     *Taggart* rejected the willfulness test as too "much like a strict-liability standard," explaining that it would improperly permit contempt sanctions to be imposed "regardless of the creditor's subjective beliefs about the scope of the discharge order, and regardless of whether there was a reasonable basis for concluding that the creditor's conduct did not violate the order." *Taggart*, 139 S. Ct. at 1803. *Taggart* also rejected the standard applied by the Ninth Circuit Court of Appeals, which insulated a creditor from contempt if the creditor had a good faith belief that the discharge injunction did not apply to its claim. *Id.* at 1802-03 (explaining that this test "is inconsistent with traditional contempt principles" and "relies too heavily on difficult-to-prove states of mind"). Although *Taggart* refined this aspect of the prior standards, it did not abandon the requirement that the creditor must have knowledge of the bankruptcy case and/or the discharge order as prerequisites to a finding of contempt. *Id.* at 1802 ("principles of 'basic fairness require that those enjoined receive explicit notice' of 'what conduct is outlawed' before being held in civil contempt") (citation omitted).

a creditor may only be held in civil contempt for violation of the discharge order "if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct;" that is, "civil contempt may be appropriate if there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful." *Taggart*, 139 S. Ct. at 1799 (emphasis in original). The party alleging civil contempt has the burden of establishing that the creditor violated the discharge injunction by clear and convincing evidence. *Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998).

It is equally well-settled that the Debtor's chapter 7 discharge extinguished the Debtor's personal liability for any deficiencies on the prepetition loan obligation, but did not affect the secured creditor's *in rem* interest in the real property or its right to foreclose on the property in the event of a default in payments.[6] *See Johnson v. Home State Bank*, 501 U.S. 78, 82-83, 111 S. Ct. 2150 (1991). In such instances, the discharge injunction in § 524(a)(2) does not prohibit all communications between the secured creditor and the

---

[6] The United States District Court for the Western District of Michigan cited this rule in its opinion dismissing the Debtor's challenge to the validity of the foreclosure action. The district court explained:

> A bankruptcy discharge does not terminate a mortgagee's right to foreclosure. "A defaulting debtor can protect himself from personal liability by obtaining a discharge in a Chapter 7 liquidation . . . [but] such a discharge extinguishes *only* the personal liability of the debtor." *Johnson v. Home State Bank*, 501 U.S. 78, 82-83 (1991) (citation omitted) (emphasis in original). "[T]he creditor's right to foreclose on the mortgage survives or passes through the bankruptcy." *Id.*

*Bouknight v. Select Portfolio Services, Inc.*, Case No. 1:18-CV-840, Dkt. No. 53, at 7 (Dec. 3, 2018). Because foreclosure is an exercise of the creditor's *in rem* rights in the property, the foreclosure action itself jwas not a violation of the discharge injunction. To the extent the Debtor has argued to the contrary in her motions, the court rejects those arguments.

debtor, but only enjoins any actions and communications designed to "collect, recover or offset" the debt as a "personal liability of the debtor."  11 U.S.C. § 524(a)(2).

Where, as here, the Debtor makes voluntary payments to the secured creditor post-discharge to retain the property without having reaffirmed the debt – sometimes referred to as a "ride-through" – an "awkward situation" arises in which the "creditor may legitimately possess a reason to communicate with [the Debtor] in the post-discharge period." *In re Biery*, 543 B.R. 267, 284 (Bankr. E.D. Ky. 2015) (citation omitted).  In these circumstances, "courts have held that it is not *per se* improper for the secured creditor to contact a debtor to send payment coupons, determine whether payments will be made on the secured debt, or inform the debtor of a possible foreclosure or repossession, as long as it is clear the creditor is not attempting to collect the debt as a personal liability." *In re Culpepper*, 481 B.R. 650, 658 (Bankr. D. Or. 2012) (quoting 4 *Collier on Bankruptcy* ¶ 524.02[2][b]).   As a practical matter, however, the line between actions and communications aimed at collecting the debt from a debtor personally and those intended to provide the debtor with relevant information (such as about what payments are required to avoid foreclosure) is an especially fine one.  This court agrees with other courts which have held that determination of whether a violation of the discharge injunction has occurred is fact-specific and requires consideration of all of the circumstances of a particular case.  *Whitaker v. Bank of America (In re Whitaker)*, 2013 WL 2467932, *10 (Bankr. E.D. Tenn. June 7, 2013) (noting potential issues of fact in context of motion to dismiss); *In re Brown*, 481 B.R. 351, 360 (Bankr. W.D. Pa. 2012).

Congress attempted to address some of the difficulties associated with "ride-throughs" by adding § 524(j) to the Bankruptcy Code as part of the BAPCPA Amendments

of 2005.  Section 524(j) provides an exception to the discharge injunction, or "safe harbor,"

for creditors with a security interest in the debtor's principal residence.  It states that:

> Subsection 524(a)(2) does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if –
>
>> (1) such creditor retains a security interest in real property that is the principal residence of the debtor;
>>
>> (2) such act is in the ordinary course of business between the creditor and the debtor; and
>>
>> (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

11 U.S.C. § 524(j).  In this case, it is undisputed that Bank of America and SPS were

acting on behalf of secured creditors who held a valid lien on the Debtor's residence.

Therefore, § 524(j) will apply to any actions they undertook to obtain periodic payments

in lieu of foreclosure in the ordinary course of business.

The Debtor has alleged that Bank of America violated the discharge injunction by:

(1) sending her monthly mortgage statements from 2010 to July of 2017; (2) sending her

mortgage loan modification solicitations; and (3) entering into the actual Home Affordable

Modification Agreement with her on May 13, 2014.  She argues that SPS also violated

the discharge injunction by:  (1) sending her monthly statements from July 2017 to

September 2018; and (2) calling her by telephone on several occasions, in an alleged

attempt to collect on the prepetition debt.  The court has carefully reviewed all of the

correspondence submitted by the Debtor in support of her motions and makes the

following conclusions.

A.   *The Loan Modification Agreement and Related Correspondence.*

In her contempt motions, the Debtor states that she believed she had entered into a reaffirmation agreement concerning her mortgage debt prior to obtaining her bankruptcy discharge.  The court credits the Debtor's representation on this point, as it is consistent with the Statement of Intention included in her bankruptcy schedules.  However, it is equally apparent that the Debtor's intentions were never carried out, as neither the court's docket nor any of the other evidence presented suggests that a reaffirmation agreement was executed.   The Debtor now argues that the post-discharge Loan Modification Agreement with Bank of America is invalid because it does not meet the requirements of § 524(c).  She further asserts that Bank of America violated the discharge injunction by sending her solicitations and entering into the modification agreement.   The court disagrees with the Debtor on both points.

First, the loan modification was not a reaffirmation agreement and did not need to satisfy the requirements of § 524(c).  As the Tenth Circuit Bankruptcy Appellate Panel explained in *In re Jester*:

> A reaffirmation agreement is a contract between a debtor and a creditor where the debtor agrees to reassume the *in personam* liability of a dischargeable debt in order to keep the property for which the debt was incurred while making periodic payments on that property.

*In re Jester*, 2015 WL 6389290, *6 (10th Cir. B.A.P. Oct. 22, 2015) (unpublished opinion), *aff'd*, 656 F. App'x 425 (10th Cir. 2016).  In the present case, the Loan Modification Agreement expressly provided that the Debtor would have no personal liability on the debt created under the agreement.  The agreement was not a reaffirmation of the Debtor's personal liability under the mortgage loan.

20

For the same reason – that is, because the Loan Modification Agreement did not attempt to impose personal liability on the Debtor for the mortgage debt – it did not constitute a violation of the discharge injunction.   Again, a creditor only violates the discharge injunction when it attempts to collect a debt "as a personal liability of the debtor."  11 U.S.C. § 524(a)(2).   The Loan Modification Agreement between the Debtor and BOA was simply a new contract, under which the Debtor "agreed to make periodic payments in exchange for [Bank of America's] forbearance of its right to foreclose on its lien."  *In re Jester*, 2015 WL 6389290, *7.  In this sense, the modification agreement was also consistent with Bank of America's ability to seek periodic payments in lieu of foreclosure under § 524(j).  The agreement did not violate the discharge injunction.

Likewise, any communications or solicitations sent to the Debtor by BOA in connection with the loan modification did not constitute attempts to collect on the mortgage debt as a personal liability of the Debtor.  Despite the Debtor's assertion that she was "coerced" into signing the Loan Modification Agreement by BOA, the Debtor's voluminous exhibits contain few, if any, documents offering modification options that pre-date the agreement.  None of the communications that mention modification options were threatening or coercive.  There is no other evidence in the record to suggest that the Debtor's execution of the modification agreement was anything but voluntary.

B.  *Written Correspondence from Bank of America*.

As noted previously, the correspondence the Debtor received from Bank of America can be broken down into seven categories.  The Debtor's contempt motions focus on the propriety and content of the monthly statements, so the court's analysis will begin with those documents.

21

The first monthly statement received by the Debtor after entry of her discharge was dated June 16, 2011, and shows a payment due on July 1, 2011. (Debtor's Exh. p. 158-59.)  It does not reference the Debtor's bankruptcy filing or entry of her chapter 7 discharge.  There is no information in the record explaining why Bank of America did not promptly update its records and forms to reflect the Debtor's bankruptcy.  However, this problem was corrected in the statement showing the payment due on October 1, 2011. (p. 156-57.)  That statement, and every monthly statement sent by Bank of America thereafter, includes detailed and prominent disclaimer language addressing the impact of the Debtor's bankruptcy, and informing the Debtor that BOA was not seeking collection from her personally.

As previously stated, the distinction between communications that improperly seek to impose personal liability on a debtor and those that merely seek periodic payments in lieu of foreclosure is dependent, to a great extent, on the content of the correspondence. *See In re Biery*, 543 B.R. at 287 (explaining that a "majority of courts" interpret § 524(j)(3) "as a limitation on the content" of communications that may be sent by a secured creditor post-discharge).  Although not entirely dispositive,[7] inclusion of "clear and prominent disclaimers" informing discharged debtors that the creditor is "solely seeking payment as a substitute for pursuing [its] *in rem* rights" is an effective way for the creditor to identify the purposes of the communications and to ensure that violation of the discharge injunction does not occur.  *Id.*  Accordingly, the presence, prominence, and clarity of disclaimer language in post-discharge communications with debtors is often a significant

---

[7]     *See In re Whitaker*, 2013 WL 2467932 at *8 & n. 4 (noting that including disclaimer language "will not serve to insulate an otherwise improper demand for payment" in all instances; similarly, the absence of disclaimer language will "not automatically render the communication a *per se* violation of the discharge injunction").

22

factor in a court's determination of whether the communications violate the discharge injunction.  *Compare Jones v. Bac Home Loans Servicing, L.P. (In re Jones)*, 2009 WL 5842122, *3 (Bankr. S.D. Ind. Nov. 25, 2009) (unpublished opinion) (letter that was "replete with references that the [d]ebtor was not obligated to pay the debt" fell "squarely within the § 524(j)(3) exception") *with Brown v. Bank of America (In re Brown)*, 481 B.R. 351, 361 (Bankr. W.D. Pa. 2012) (statements that lacked appropriate disclaimer language, indicated amount of payment, when it was due, potential late charges, and past due amount violated discharge injunction).

After analyzing the BOA statements in light of all the facts and circumstances of this case, the court concludes that the statement showing a payment due on July 1, 2011 violated the discharge injunction.  This statement does not differ, in any meaningful way, from the statements that were sent to the Debtor prior the entry of her discharge.  *See In re Biery*, 543 B.R. 286-87 ("How can a communication that seeks to request payment of a personal liability when sent to a non-bankruptcy customer be something different when sent to a discharged debtor?").  It does not acknowledge her bankruptcy filing, nor include any other language indicating its purpose.  *Id.* at 288 (holding that such statements "convey the message that their recipients personally owe money, not that their recipients may voluntarily make payments if they wish to avoid default and foreclosure").  In the absence of proper disclaimer language, the court cannot construe the July 1, 2011 statement as anything other than what it appears to be:  an attempt to collect the mortgage debt as a personal liability of the Debtor in violation of § 524(a)(2).  For the same reason, the court cannot find that the statement solely seeks payment in lieu of foreclosure under § 524(j)(3).  BOA has not refuted the Debtor's assertion it was aware of her bankruptcy case and discharge when this statement was sent, it has not argued that the statement

was sent unintentionally, and it has offered no other "objectively reasonable basis" on which the court can conclude that its conduct in sending the July 1, 2011 statement may have been lawful.

By contrast, the court holds that the BOA statements showing payments due on October 1, 2011 and thereafter were for informational purposes only and do not represent attempts to collect the mortgage debt as a personal liability of the Debtor in violation of the discharge injunction. These statements include appropriate disclaimers informing the Debtor of the purpose of the correspondence and acknowledging the discharge of her personal liability on the debt. Nothing in the record suggests that the statements were unduly coercive or that they otherwise demanded payment despite the inclusion of disclaimer language stating to the contrary.

The court further holds that these communications fall under the safe-harbor provision of § 524(j). It is clear from the number and regularity of the statements, that they were sent to the Debtor in the ordinary course of Bank of America's business. All of the evidence in the record suggests that the Debtor and BOA (and later SPS) were engaged in a typical mortgage borrower/lender relationship. The underlying mortgage in this case was a standard residential mortgage. Both BOA and SPS are mortgage loan servicers, a role which requires communication with borrowers about payments that are due, pending foreclosures, and other issues pertaining to the loan. The Debtor has not argued otherwise. It is equally apparent that the purpose of the statements was to obtain periodic payments on the mortgage debt in lieu of BOA exercising its foreclosure rights in the property. The disclaimers on the statements confirm this purpose. These monthly statements meet the requirements of § 524(j) and did not violate the discharge injunction.

24

The same reasoning applies to the other categories of correspondence included in the Debtor's exhibits. As previously noted, the other statements received by the Debtor, the letters regarding adjustments to the interest rate on her loan, and letters pertaining to the mortgage escrow account were for informational purposes only and did not represent attempts to collect a debt. Almost without exception, the documents include disclaimers advising the Debtor of this fact.

The responses to inquiries made by the Debtor were contacts initiated by the Debtor, and likewise cannot be considered as attempts to collect the mortgage debt. Even if they were construed as seeking payment, all but one of the letters includes disclaimer language noting the Debtor's bankruptcy and the discharge of her personal liability on the debt. Similarly, the generic correspondence received by the Debtor does not reference her specific loan or seek payment on the debt in any way. Even in the absence of disclaimer language, these communications cannot be construed as seeking to collect the mortgage debt as a personal liability of the Debtor.

Finally, the court has carefully considered whether any of the notices regarding potential foreclosure or acceleration of the loan constituted violations of the discharge injunction. They do not. For instance, the court has reviewed the Notice of Intent to Accelerate dated January 15, 2015. Like some of the monthly statements, it sends mixed signals by referring to payments that are past due, listing late charges, and indicating that failure to cure the default will result in possible foreclosure. However, these statements are offset by disclaimers on the fourth page of the document that clearly outline the effect of the Debtor's bankruptcy filing. On balance, the court does not find that these documents were impermissible attempts to collect the debt from the Debtor personally. Even if they were sent for collection purposes, the court finds that they were provided by

25

BOA in the ordinary course of business and were solely for the purpose of obtaining payment in lieu of foreclosure proceedings.

In summary, the court finds that the July 1, 2011 statement sent by Bank of America was an attempt to collect the mortgage debt as a personal liability of the Debtor and violated the discharge injunction. With regard to the other communications from BOA, the court concludes that no violation of the discharge injunction occurred.

This court may remedy a violation of the discharge injunction "by awarding damages to the injured debtor pursuant to 11 U.S.C. § 105(a)." *In re Martin*, 474 B.R. 789, 2012 WL 907090, *5 (6th Cir. B.A.P. Mar. 7, 2012) (unpublished opinion). The sanctions imposed for contempt "are intended to be either compensatory, based on evidence of actual loss, or coercive through payments to the court to abate violation of the order." *Lohmeyer v. Alvin's Jewelers (In re Lohmeyer)*, 365 B.R. 746, 749 n.2 (Bankr. N.D. Ohio 2007) (internal citation omitted). The damages awarded "must not be based on mere speculation, guess, or conjecture." *Archer v. Macomb County Bank*, 853 F.2d 497, 499 (6th Cir. 1988) (discussing damages for violation of the automatic stay) (additional citations omitted). Instead, the Debtor must establish that she suffered an actual injury by providing "relatively specific and certain" proof of her damages. *Id.*; *see In re Martin*, 2012 WL 907090, at *5.

Unfortunately for the Debtor, the record before the court does not establish that the Debtor suffered any actual, non-speculative damages as a result of receiving the July 1, 2011 statement. The statement is one of 84 communications referenced in the Debtor's Affidavit of Damages. For each communication, the Debtor requests $1,000 in damages. The affidavit does not provide any explanation as to how the Debtor arrived at this number. Instead of reflecting actual losses suffered as a result of the alleged improper

26

communications, the Debtor's Amended Motion suggests that she chose the $1,000 amount based on the damages that have been awarded "in similar bankruptcy cases." (Amended Motion, Dkt. No. 38, at 8.)   The Debtor's request for emotional distress damages in the amount of $40,000[8] and attorney's fees in the amount of $5,000 are equally vague and unsubstantiated.  In addition, there is nothing in the record suggesting a causal connection between these amounts and the July 1, 2011, statement.[9]  Because there is no evidence before the court to establish that the Debtor suffered actual damages as a result of receiving the statement, the court declines to award any damages for BOA's violation of the discharge injunction.

C.   *Written Correspondence and Phone Calls from SPS*.

The Debtor's exhibits also include several categories of correspondence received from SPS after it took over the servicing of her mortgage loan in 2017.  The Debtor's

---

[8]     There is a split of authority regarding whether a debtor may be awarded damages for emotional distress when a violation of automatic stay or discharge injunction has been established. *Compare United States v. Harchar*, 331 B.R. 720, 728 (N.D. Ohio 2005) (noting the circuit split and concluding that damages for emotional distress are not recoverable in actions for violation of the automatic stay) *with Bankers Healthcare Group, Inc. v. Bilfield (In re Bilfield)*, 494 B.R. 292, 303 (Bankr. N.D. Ohio 2013) (stating, in dicta, that emotional distress damages are among the "actual damages that can be recovered for a stay violation").  Assuming that emotional distress damages may be appropriate in some instances, most courts require the debtor to provide at least some corroborating evidence of such damages and to establish a close casual connection between the creditor's actions and the harm suffered.  *See, e.g., McCool v. Beneficial (In re McCool),* 446 B.R. 819, 824 (Bankr. N.D. Ohio 2010).  The Debtor in this case has not presented proof that receipt of the July 1, 2011, statement caused any specific emotional harm and has not offered any corroborating evidence of the general harms that have been alleged.

[9]     With regard to the requested attorney's fees, the Debtor's motions state that she hired an attorney in November 2017, just prior to the initiation of the foreclosure proceedings in May 2018.  This occurred many years after the Debtor received the July 1, 2011 statement.  There is no evidence in the record suggesting that the Debtor incurred any post-bankruptcy legal fees before November 2017.

motions for contempt focus on the monthly statements and phone calls she received from SPS.

Like the BOA monthly statements, the SPS statements include prominent disclaimer language acknowledging the Debtor's bankruptcy filing, stating that they are for informational purposes only, and indicating that they are not an attempt to collect a debt. Many of the statements do not even include an "amount due," a fact the Debtor recognizes – and argues was misleading – in her contempt motions. Like the statements sent by Bank of America, the SPS statements were not an attempt to collect the mortgage debt as a personal liability of the debtor. The statements were, however, documents sent in the ordinary course of business to obtain payments in lieu of foreclosure under § 524(j).

The court also concludes that the Debtor failed to meet her burden of proving that the phone calls placed by SPS to the Debtor were attempts to collect the mortgage debt in violation of the discharge injunction. The only evidence submitted by the Debtor with regard to the phone calls is the list she provided, which references thirteen calls received from SPS from July 28, 2017 through August 11, 2017. The Debtor's exhibit states that she spoke to a customer service representative for SPS but does not include any detail regarding their conversation except that she asked him to stop calling. There is no evidence upon which the court could conclude that SPS was attempting to collect the debt as a personal liability of the Debtor during these calls. To the contrary, the declaration submitted by SPS, which the Debtor did not refute, suggests that the majority of calls placed by SPS went unanswered. SPS represents that it did not leave a message. In the three calls that were answered, SPS states that it did not disclose any account information or seek collection of the debt in those calls. The SPS declaration states that the purpose of the calls was to seek payments in lieu of foreclosure as permitted by

28

§ 524(j).  Even assuming that is true, it does not appear that the calls ever progressed far enough to accomplish that limited purpose.

The other correspondence from SPS included in the Debtor's exhibits also fails to establish that SPS violated the discharge injunction.  The responses to the Debtor's inquiries and payoff statements were sent after contact was initiated by the Debtor.  All of the documents include appropriate – and often specific – disclaimers.  The correspondence regarding the servicing transfer does not seek payment of a debt and also includes disclaimer language.  The notices regarding the foreclosure proceedings also contain appropriate disclaimers.  To the extent any of these documents request payment, they do so in the ordinary course of business and only in lieu of continuing foreclosure proceedings under § 524(j).

V.    <u>CONCLUSION</u>.

Certainly, this case resembles the "awkward situation" described by the bankruptcy court in *Biery*.  The scenario creates waters that are legally difficult to navigate, both for mortgage creditors seeking payments in lieu of foreclosure and for debtors seeking to retain their homes absent a reaffirmation agreement.  This is particularly true for Ms. Cantrell, who has chosen to navigate those turbulent waters without the assistance of legal counsel, who might have assisted her in both evaluating her claims as well as in identifying actual damages that might be linked to the one violation that did occur.

From the Debtor's perspective, it was understandably confusing to receive myriad statements, and other correspondence, from both BOA and SPS for years after her discharge was entered and her bankruptcy case was completed.  However, a careful review of those documents reveals that many were provided for informational purposes only and were not an attempt to collect pre-bankruptcy obligations.  Others, such as

the monthly statements, save for one, all contain appropriate disclaimer language that was sufficient to bring the actions of both BOA and SPS within the protections of § 524(j).   The Debtor has not met her burden of establishing that there was no objectively reasonable basis for concluding that the creditors' actions might be lawful; accordingly, her motions fail as to both BOA (except for the June 16, 2011 statement) and SPS.

The one BOA statement, dated June 16, 2011, did violate the protections of the discharge injunction.  By October 2011, BOA had remedied the problem and did not offend again for the next six years, at which time servicing was transferred to SPS.   No purpose would be served by imposing contempt sanctions, which are intended to coerce obedience to the discharge injunction, against BOA for this one violation since it corrected the problem nearly eight years ago and did not violate the discharge injunction again. Even if the court were inclined to impose compensatory damages for this one violation, the damages alleged by the Debtor in this case are too speculative to support such an award.

Accordingly, while the communications received by the Debtor may have been somewhat confusing on a practical level, they do not constitute legally compensable violations of the discharge injunction.  The Debtor's motions for contempt are denied, and a separate order shall be entered accordingly.

**IT IS SO ORDERED.**

**Dated August 14, 2019**





James W. Boyd
United States Bankruptcy Judge